UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION


AMOS A. C.[1],

                                    Plaintiff,

v.

COMMISSIONER, SOCIAL SECURITY
ADMINISTRATION,

                                    Defendant.

Case No.: 6:18-cv-1185-MK

OPINION AND ORDER


**KASUBHAI, Magistrate Judge:**

Plaintiff Amos A. C. brings this action for judicial review of the Commissioner of Social Security's ("Commissioner's") decision denying his application for Disability Insurance Benefits under the Social Security Act (the "Act"). This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). Both parties consent to jurisdiction by a U.S. Magistrate Judge.

For the reasons discussed below, the Court remands for the immediate calculation and award of benefits.

---

[1] In the interest of privacy, this Opinion and Order uses only the first name and the initial of the last name of the non-governmental parties in this case.

## BACKGROUND

Plaintiff applied for Disability Insurance Benefits on September 24, 2014, alleging disability beginning June 20, 1987. Tr. 72. His claims were initially denied and Plaintiff timely requested and appeared for a hearing before Administrative Law Judge ("ALJ") Steven A. De Mondbreum on April 18, 2017. *Id.* During the hearing, Plaintiff's attorney amended the onset date of disability to September 24, 2014 ("AOD"). Tr. 72, 214. The ALJ denied Plaintiff's application in a written decision dated June 21, 2017. *See* Tr. 72-88. Plaintiff sought review from the Appeals Council. *See* Tr. 6-63. The Appeals Council denied review of the ALJ's decision, rendering the ALJ's decision the final decision of the Commissioner. Tr. 1-4. Plaintiff now seeks judicial review of the decision.

## STANDARD OF REVIEW

A reviewing court shall affirm the Commissioner's decision if the decision is based on proper legal standards and the legal findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012) (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)). To determine whether substantial evidence exists, a court reviews the administrative record as a whole, "weighing both the evidence that supports and detracts from the ALJ's conclusion." *Davis v. Heckler*, 868 F.2d 323, 326 (9th Cir. 1989).

## DISCUSSION

The Social Security Administration utilizes a five-step sequential evaluation to determine whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. The initial burden of proof

rests upon the claimant to meet the first four steps. *Id.* If the claimant satisfies his burden with respect to the first four steps, the burden shifts to the commissioner at step five. *Id.*; *see also Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995). At step five, the Commissioner must show that the claimant is capable of making an adjustment to other work after considering the claimant's residual functional capacity ("RFC"), age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(v) & 416.920(a)(4)(v). If the Commissioner fails to meet this burden, then the claimant is disabled. *Id.* If, however, the Commissioner proves that the claimant is able to perform other work existing in significant numbers in the national economy, the claimant is not disabled. *Id.*; *see also Bustamante v. Massanari*, 262 F.3d 949, 953–54 (9th Cir. 2001).

In the present case, the ALJ found that Plaintiff was not disabled. At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since the amended onset date of September 24, 2014. Tr. 74. At step two, the ALJ found Plaintiff had the following severe impairments: bilateral carpal tunnel syndrome; nonischemic cardiomyopathy status post internal cardiac defibrillator (ICD) placement; diabetes type I; Charcot-Marie-Tooth disease; right eye blindness; history of borderline intelligence; unspecified depression; anxiety disorder not otherwise specified; and panic attacks as a reaction to stress. *Id.* At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled the requirements of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1 ("Listings"). Tr. 76.

Prior to step four, the ALJ determined that Plaintiff retained residual functional capacity ("RFC") that allowed him to perform light work. Tr. 78. Specifically, the ALJ found that Plaintiff can:

> lift/carry, including upward pulling, ten pounds frequently and twenty pounds occasionally. He is able to stand and/or walk for two hours total in an eight-hour

workday with normal breaks.  He is able to sit for six or more hours total in an eight-hour workday with normal breaks.  He is able to perform work limited to frequent bilateral handling and fingering.  He is able to perform work limited to occasional climbing of ramps or stairs, but can never climbing [*sic*] ladders, ropes, or scaffolds.  He is able to perform work limited to frequent kneeling, crouching, crawling, and/or stooping.  He must have no exposure to hazards, such as dangerous machinery and unprotected heights. He is able to perform work limited to only simple, easy to learn, routine, unskilled work with a Dictionary of Occupational Titles (DOT) General Education Development (GED) reasoning level of two or less.

Tr. 78-79.

At step four, the ALJ found that Plaintiff has no past relevant work. Tr. 86.  At step five, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform based on his age, education, work experience, and RFC, such as escort vehicle driver, assembler small products I, electronic assembler, and food checker. Tr. 87.

Plaintiff seeks review by this Court contending that (1) the ALJ erred in finding that Plaintiff did not meet the requirement of the Listings – specifically 4.02 – at step three; (2) the ALJ failed to address Dr. Puckett's November 2016 opinion classifying Plaintiff as New York Heart Association ("NYHA") "Class II with recent III symptoms;" (3) the ALJ failed to provide legally sufficient reasons to reject Dr. Balm's opinion; and (4) the ALJ erred in rejecting Plaintiff's subjective complaints. Pl.'s Br. 2 (ECF No. 14).

In response the Commissioner only addresses Plaintiff's contention regarding the ALJ's error at step three and "denies any arguments not specifically addressed." *See generally*, Def.'s Br. (ECF No. 17).  The Commissioner concedes that the ALJ erred in evaluating Plaintiff's case "because the ALJ likely did not consider all of the probative evidence," but objects to a reversal for an immediate calculation of benefits. *Id.*  Instead, the Commissioner requests a remand for further administrative proceedings. *Id.* at 6.

## I. Listed Impairments at Step Three

A claimant is disabled if his impairments meet or equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. 20 C.R.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

Chronic heart failure ("CHF") is a listed impairment. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 4.00D.

There are two main types of CHF:

(i) Predominant systolic dysfunction (the inability of the heart to contract normally and expel sufficient blood), which is characterized by a dilated, poorly contracting left ventricle and reduced ejection fraction (abbreviated EF, it represents the percentage of the blood in the ventricle actually pumped out with each contraction), and

(ii) Predominant diastolic dysfunction (the inability of the heart to relax and fill normally), which is characterized by a thickened ventricular muscle, poor ability of the left ventricle to distend, increased ventricular filling pressure, and a normal or increased EF.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 4.00D1a.

Listing 4.02 provides:

The required level of severity for [the Listing 4.02 CHF] impairment is met when the requirements in both A and B are satisfied.

A. Medically documented presence of one of the following:

1. Systolic failure (see 4.00D1a(i)), with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); or

…

AND

B. Resulting in one of the following:

…

3. Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to:

a. Dyspnea, fatigue, palpitations, or chest discomfort; or

…

20 C.F.R. Pt. 404, Subpt. P, App. 1.

The ALJ found that "[t]the claimant's cardiac impairment does not meet or medically equal Listing 4.02 because there is no evidence of systolic or diastolic failure with evidence that the claimant is very seriously limited in his ability to initiate, sustain, or complete activities of daily living; no episodes of acute congestive heart failure; and no findings of an inability to complete an exercise tolerance test." Tr. 76. In making this finding, the ALJ cites that Plaintiff's ejection fraction of 35% does not meet the requirement of Listing 4.02A. Tr. 76, 629 (record of November 13, 2016). The ALJ also does not mention any MET results in the record. *See* Tr. 76-80; Pl.'s Reply 4 (ECF No. 18).

As to Listing 4.02A, Plaintiff points to the record that his left ventricular ejection fraction was measured at 30% in August 2016 during a period of stability, which satisfies Listing 4.02A(1) – "ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure)." Pl.'s Br. 4 (ECF No. 14); Tr. 731. The record of September 2016 shows that "[c]ompared to echocardiogram done 8/23/2016, LV [Left Ventricular] systolic function continues to appear severely reduced with ejection fraction 25%(+/-5)." Pl.'s Br. 4-5 (ECF No. 14); Tr. 733-34. The 25% ejection fraction also satisfies Listing 4.02A(1). Pl.'s Br. 5 (ECF No. 14).

The Commissioner concedes that the ALJ omitted discussion of Plaintiff's 30% and 25% ejection fractions when evaluating Plaintiff's impairment under Listing 4.02A. Def.'s Br. 3-5 (ECF No. 17).

As to Listing 4.02B, Plaintiff achieved "a peak workload of Max. METS: 3.9" when performing an exercise test in February 2014 and the "[t]est was terminated" because of "chest

pain mid sternum." Tr. 495. Plaintiff contends that he met the requirement of Listing

4.02B(3)(a) – "[i]nability to perform on an exercise tolerance test at a workload equivalent to 5

METs or less due to … chest discomfort" – because "chest pain mid sternum" is consistent with

"chest discomfort." Pl.'s Br. 6 (ECF No. 14). Additionally, in contrast to Listings 4.02B(1)[2] and

4.02B(2)[3] which include a twelve-month period requirement, Listing 4.02B(3) does not have

such a requirement. Pl.'s Br. 6 (ECF No. 14) (citing *Frank v. Colvin*, No. 6:14-CV-01434-AC,

2015 WL 6150852, at *3 (D. Or. Oct. 19, 2015) (explanatory parentheticals omitted). Nor does

Listing 4.02B(3) require more than one exercise tolerance test. Pl.'s Reply 4 (ECF No. 18)

(citing *Frank*, 2015 WL 6150852, at *3 ("while §§ 4.02B(1) & (2) include variations of a

twelve-month period, § 4.02B(3) requires only the inability to perform on *an* exercise tolerance

test …") (emphasis added).

The Commissioner does not respond to Plaintiff's argument that Listing 4.02B(3) has no

twelve-month period requirement. *See generally*, Def.'s Br. (ECF No. 17). Therefore, the

Commissioner has waived the argument on this issue. *United States v. McEnry*, 659 F.3d 893,

902 (9th Cir. 2011) (where an argument is available but not raised, it is waived). The Court finds

Plaintiff's argument persuasive and therefore finds that Listing 4.02B(3) does not require a

twelve-month period. It follows that Listing 4.02B(3) does not require more than one exercise

tolerance test.

The record provides three ejection fraction measures after Plaintiff's ICD implantation in

September 2014. They were 30% in August 2016, 25% in September 2016, and 35% in

---

[2] Listing 4.02B1 requires "[p]ersistent symptoms of heart failure …" "Persistent means that clinical record shows that, with few exceptions, the required finding(s) has been present, or is expected to be present, for a continuous period of at least 12 months …" 20 C.F.R. Pt. 404, Subpt. P, App. 1., Pt. A, 4.00A3b.
[3] Listing 4.02B2 requires "[t]here or more separate episodes of acute congestive heart failure within a consecutive 12-month period …"

November 2016.  Tr. 731, 733-34, 629.  The ALJ only cited the one ejection fraction above the Listing 4.02A level to support his conclusion that Plaintiff "does not actually meet the requirement." Tr. 76.  The ALJ's finding is based solely on the evidence favoring his conclusion. Because there is evidence in the record showing Plaintiff met Listing 4.02A, the ALJ's determination is not supported by substantial evidence.

Similarly, the ALJ concluded that there are "no findings of an inability to complete an exercise tolerance test." Tr. 76.  The ALJ cited Plaintiff's pre-ICD placement record and found that "[t]he record indicates that the claimant was able to perform an exercise stress test even prior to his ICD placement." *Id.* (citing Ex. B3F/54).  The ALJ misstated the requirement of Listing 4.02(B)(3).  Listing 4.02B(3) does not evaluate whether a claimant is able to perform an exercise stress test, it evaluates whether he is able to perform the test at a certain workload – 5 METs or less.  Plaintiff's METs prior to the ICD placement was at 3.9. Tr. 495.

The record provides two more MET measures.  After the ICD placement, Plaintiff had two measures of performance on an exercise tolerance test during his cardiac rehabilitation sessions in December 2016 and March 2017 with the result of 2.3 METs in both tests, with the exercise goal of 3.5 METs. Tr. 723, 795.  The post-ICD measures were even lower than before the ICD implantation. Tr. 495.  Nonetheless, the ALJ found that "[a]t no time throughout the period at issue was there evidence of any recurrent cardiological issue or evidence of cardiac decompensation …" Tr. 80.  The ALJ's conclusion is contradicted by the record and is not supported by substantial evidence.

While the Commissioner concedes that the ALJ erred, the Commissioner objects to a remand for immediate calculation of benefits but requests the Court remand the matter for further proceedings for the ALJ to re-evaluate Plaintiff's heart condition because "the record has not

been fully developed, there are outstanding issues that need to be resolved, and further administrative proceedings would be useful." Def.'s Br. 5 (ECF No. 17).

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000), *cert. denied*, 531 U.S. 1038, 121 S.Ct. 628, 148 L.Ed.2d 537 (2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Strauss v. Comm'r*, 635 F.3d 1135, 1138-39 (9th Cir. 2011) (quoting *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004)). The Court may not award benefits punitively and must conduct a "credit-as-true" analysis to determine if a claimant is disabled under the Act. *Id.* at 1138.

Under the "credit-as-true" doctrine, evidence should be credited and immediate award of benefits directed where: (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. *Id.* The "credit-as-true" doctrine leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision. *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003) (citing *Bunnell v. Sullivan*, 947 F.2d 341, 348 (9th Cir. 2003)). The reviewing court should decline to credit testimony when "outstanding issues" remain. *Luna v. Astrue*, 623 F.3d 1032, 1035 (9th Cir. 2010).

The Commissioner does not dispute that step one of the credit-as-true doctrine is satisfied. Def.'s Br. 5 (ECF No. 17). As to step two of the credit-as-true doctrine, the Commissioner contends that two issues should be resolved at the administrative level. *Id.* at 5-6.

Specifically, "[w]hile Plaintiff has demonstrated an EF [ejection fraction] of 30% or less during a period of stability post-ICD placement, his most recent record reveals an EF of 35%." *Id.* at 5. "Moreover, the evidence of Plaintiff's performance on exercise tolerance test is equivocal." *Id.* The Commissioner notes that "Plaintiff underwent physical therapy to increase his METs" after the ICD implantation, where "he achieved METs of 2.3, with a goal of 3.5." *Id.* at 5 and n. 4. However, the Commissioner does not specify what part of Plaintiff's performance on exercise tolerance test is "equivocal." *See Id.* at 5. The record shows that Plaintiff's post-ICD METs were consistently lower than pre-ICD implantation. His post-ICD goal of 3.5 METs is even lower than his pre-ICD METs at 3.9. Plaintiff's inability to perform the exercise tolerance test both before and after the ICD placement is consistent and satisfies Listing 4.02B(3)(a).

Regarding Plaintiff's ejection fraction, there is substantial evidence that Plaintiff may meet Listing 4.02A. There is also evidence of Plaintiff's ejection fraction that Plaintiff does not meet Listing 4.02A. For this reason, the Court should not speculate whether the ALJ would find that Plaintiff meets Listing 4.02A if the ALJ considered the 30% and 25% ejection fractions.

Listing 4.02A may also be satisfied based on the alternative measure of left ventricular end diastolic. The ALJ also found that Plaintiff's "left ventricular end diastolic of 5.9 [cm] …" does not meet Listing 4.02A. Tr. 76. "[L]eft ventricular end diastolic dimensions greater than 6.0 cm" is an alternative measure to "ejection fraction of 30 percent or less" in Listing 4.02A(a). Plaintiff argues that his Left Ventricular Internal Diastolic dimensions ("LVIDd") after the ICD installation was worse than his pre-ICD LVIDd, "almost to the point of meeting [the requirement of] Listing 4.02A(1)." Pl.'s Br. 5 (ECF No. 14). The record however does not support Plaintiff's assertion of a worsening LVIDd. Prior to the ICD installation, Plaintiff's LVIDd was measured twice at 5.7 cm and once at 6.1 cm. Tr. 472 (July 16, 2014), 477 (February 6, 2014), 484

(January 22, 2014). His LVIDd after the ICD installation was 5.9 cm. Tr. 630. The 5.9 cm

LVIDd was measured at the time when Plaintiff had the 35% ejection fraction. Pl.'s Br. 5 (ECF

No. 14); Tr. 714. While Plaintiff's LVIDd after the ICD placement did not show a clear trend of

improvement, it also did not satisfy the alternative measure of Listing 4.02A(1).

Plaintiff also challenges the ALJ's finding at step three for failure to consider his listed

impairments in combination. Pl.'s Br. 7 (ECF No. 14).

In determining whether a claimant's severe impairments meet the Listing of Impairments

contained in the regulations, the ALJ must consider the combined effect when a claimant suffers

from multiple impairments. *Macri v. Chater,* 93 F.3d 540, 545 (9th Cir. 1996). "The

Commissioner must also 'adequately explain his evaluation of alternative tests and the combined

effects of the impairments[.]' Thus, if [the claimant's] conditions – separately or in combination

– meet or equal a listed impairment, he is conclusively disabled." *McClain v. Halter*, 10 F.

App'x 433, 436 (9th Cir. 2001) (internal citations omitted); 20 C.F.R. § 404.1520(d).

Here at step three, the ALJ discussed in sequence Plaintiff's bilateral carpal tunnel

syndrome ("CTS"), cardiac impairment, right eye blindness, Charcot-Marie-Tooth ("CMT")

disease and CTS, diabetes, and mental impairment. Tr. 76-78. The only discussion of

impairments in combination is Plaintiff's CMT disease and bilateral CTS. Tr. 77. The ALJ erred

in failing to discuss Plaintiff's impairments in combination. *McClain*, 10 F. App'x at 436 (The

ALJ failed to evaluate the claimant's impairments in combination and the court reversed and

remanded for proper consideration of the claimant's impairments). The Court however should

not speculate whether the ALJ would find Plaintiff's impairments meeting the Listings if the ALJ

considered them in combination.

Plaintiff raised additional issues for review.  If the review of the remaining issues reveals that there are outstanding issues to be resolved, the Court will remand for reevaluation of Plaintiff's impairments at step three.  If the review shows that no useful purpose would be served by further administrative proceedings, the Court will then remand for immediate calculation of benefits.

## II. Medical Opinion Evidence

The ALJ is responsible for resolving conflicts in the medical record, including conflicts among physicians' opinions. *Carmickle v. Comm'r., Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008).  Specific and legitimate reasons for rejecting a physician's opinion may include its reliance on a claimant's discredited subjective complaints, inconsistency with medical records, inconsistency with a claimant's testimony, inconsistency with a claimant's daily activities, or that the opinion is brief, conclusory, and inadequately supported by clinical findings. *Bray v. Commissioner*, 554 F.3d 1219, 1228 (9th Cir. 2009); *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008); *Andrews v. Shalala*, 53 F.3d 1035, 1042–43 (9th Cir. 1995).  An ALJ errs by rejecting or assigning minimal weight to a medical opinion "while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis" for the ALJ's conclusion. *Garrison*, 759 F.3d at 1013; *see also Smolen*, 80 F.3d at 1286 (noting that an ALJ effectively rejects an opinion when he or she ignores it).

"An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Garrison*, 759 F.3d at 1012 (quoting *Reddick*, 157 F.3d at 725). In other words, "[t]he ALJ must do more than offer his conclusions.  He must set forth his own

interpretations and explain why they, rather than the doctors', are correct." *Reddick*, 157 F.3d at 725 (citing *Embrey v. Bowen*, 849 F.2d 418, 421–22 (9th Cir. 1988)). "[T]he opinion of a nonexamining medical advisor cannot by itself constitute substantial evidence that justifies the rejection of the opinion of an examining or treating physician." *Morgan v. Comm'r Soc. Sec. Admin.*, 169 F.3d 595, 602 (citations omitted); *but see id.* at 600 (opinions of non-treating or nonexamining physicians may serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record).

### A. Dr. Puckett

The ALJ concluded that "the longitudinal record shows that [Plaintiff's] [cardiac impairment] condition is well controlled with the installation of an ICD device." Tr. 80. The ALJ supported his conclusion with two treating physicians' opinions in the record:

> Prior to the placement of this device [ICD], a treating cardiologist [Dr. Michael Trojan] noted that his cardiac symptoms were consistent with New York Heart Association (NYCA) [*sic*] Class II to Class III symptoms; however, after the placement of this device, his NYCA [*sic*] classification dropped to "essentially NYCA [*sic*] Class I" level symptoms, indicating an "excellent" response to the ICD[, noted by Dr. Michael Laurie].

Tr. 80, 453 (Dr. Trojan's treatment notes in September 2014), 444 (Dr. Laurie's treatment notes in December 2014).

Dr. Puckett, Plaintiff's treating cardiologist, opined in November 2016, more than two years after Plaintiff's ICD placement, that Plaintiff's chronic systolic heart failure is NYHA "Class II with recent III symptoms due to angina and dyspnea." Tr. 697. According to American Heart Association, NYHA Class I symptoms are "[n]o limitation of physical activity. Ordinary physical activity does not cause undue fatigue, palpitation, dyspnea (shortness of breath)." *Classes of Heart Failure*, https://www.heart.org/en/health-topics/heart-failure/what-is-heart-failure/classes-of-heart-failure. NYHA Class II symptoms are "[s]light limitation of physical

activity. Comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea (shortness of breath)." *Id.* NYHA Class III symptoms are "[m]arked limitation of physical activity. Comfortable at rest. Less than ordinary activity causes fatigue, palpitation, or dyspnea." *Id.*

The ALJ did not discuss the opinion of Dr. Puckett. *See* Tr. 72-88. The ALJ erred by rejecting Dr. Puckett's opinion "while doing nothing more than ignoring it." *Garrison*, 759 F.3d at 1013. The ALJ effectively failed to resolve the conflicting opinions of Dr. Michael Laurie and Dr. Puckett by ignoring Dr. Puckett's opinion.

"[T]he regulations give more weight … to the opinions of specialists concerning matters relating to their specialty over that of nonspecialists." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001); *see* 20 C.F.R. § 404.1527(d)(5). Dr. Michael Laurie is Plaintiff's "primary care physician." Tr. 548. He is listed as an Internal Medicine doctor, not a cardiologist. *See* https://www.peacehealth.org/findadoc/care-providers/43/michael-a-laurie-md. Because Dr. Puckett is a cardiologist, a specialist, the ALJ should give more weight to Dr. Puckett's opinion, which is also more recent than Dr. Laurie's opinion and consistent with cardiologist Dr. Trojan's opinion.

"Where the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, [the Ninth Circuit] credits that opinion 'as a matter of law.'" *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 995). Therefore, the Court credits Dr. Puckett's opinion as a matter of law.

**B. Dr. Balm**

Treating neurologist Dr. Balm opined that Plaintiff's Charcot-Marie-Tooth ("CMT") disease "is a progressive neurologic disorder that is incurable, and manifests as numbness and

weakness particularly in the distal upper and lower extremities.  This impairs gait and functional use of his hands …" Tr. 816.  The ALJ gave "very little weight" to Dr. Balm's opinion for two reasons: (1) Dr. Balm's opinion "departs substantially from the rest of the evidence of [the] record," and (2) "Dr. Balm offered no substantive functional analysis." Tr. 84.

a. Dr. Balm's Opinion Departs Substantially from the Record

The ALJ cited four parts in the record and found that "a comparison with Dr. Balm's treatment notes and other treatment notes around the time Dr. Balm offered these opinions … indicates that the claimant does not have any impaired gait or impaired functional use of his hands." *Id.*  However, the ALJ's citations for his finding do not include Dr. Balm's treatment notes. *See Id.* (citing Exs. B4E/5 (Tr. 382); B11F/2 (Tr. 633); B12F/26 (Tr. 775); B13F/19-28 (Tr. 795-804)).

Dr. Balm's first treatment notes in April 2014 document that Plaintiff "feels [his neuropathy] has been ascending, no at bilateral knees in lower extremity.  In upper extremity, he again reports some decreased right hand strength as far as grip. And he also reports a constant left medial nerve distribution numbness in hands." Tr. 620.  In July 2016, Plaintiff reported "escalating right-more-than-left hand pain with numbness and tingling." Tr. 609.  During that visit, Dr. Balm noted "[e]lectrophysiologically moderate, length-dependent, predominantly axonal, sensorimotor polyneuropathy (consistent with possible type 2 Charcot-Marie-Tooth disease, or possibly diabetic polyneuropathy)." *Id.*  Dr. Balm's most recent treatment notes in March 2017 state that Plaintiff's "muscle strength, bulk, and tone are notable for weakness in finger extensors, interossei, and finger flexors at 5-/5, with foot dorsiflexors, toe extensors, and foot inverters and everters are weak at 4-/5 and toe flexors and foot plantar flexors are weak at 5-/5. … He has a stocking-glove distribution sensory loss at -2 at the level of the writs, -3 at the

level of the ankles, and -2 to knee level.  He is able to stand and ambulate independently without a gait aid, but does have moderate bilateral foot drop and impaired tandem gait at -2." Tr. 600.

Dr. Balm's treatment notes consistently document Plaintiff's CMT symptoms of "numbness and weakness particularly in the distal upper and lower extremities" as Dr. Balm opined. Tr. 816.  Regarding Plaintiff's gait, Dr. Balm documented that Plaintiff has moderate bilateral foot drop and impaired tandem gait. Tr. 600.  Regarding the functional use of Plaintiff's hands, Plaintiff testified that he cannot grasp on anything long enough to use and he drops objects from his right hand. Tr. 220-21.  Plaintiff's testimony is consistent with Dr. Balm's notes of "muscle strength, bulk and tone are notable for weakness in finger extensors, interossei, and finger flexors …" Tr. 600.  Contrary to the ALJ's finding that Plaintiff does not have any impaired gait or impaired functional use of his hands, the medical record and Plaintiff's testimony are consistent with Dr. Balm's opinion that Plaintiff's gait and functional use of his hands are impaired.  The ALJ's finding is not supported by substantial evidence.

Additionally, the ALJ failed to explain the basis for this conclusion.  Instead, the ALJ provided two "motives" as the rationale for his conclusion. Tr. 84.  The ALJ wrote:

> the possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he sympathizes for one reason or another. Another reality is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.

*Id.*

Where an ALJ's speculation is not supported by specific evidence, "the rationale [of inappropriate motives or sympathy] fails to meet the requisite specific-and-legitimate legal standard." *Needham v. Comm'r of Soc. Sec.*, No. 3:16-CV-01380-YY, 2017 WL 4052184, at *11

(D. Or. Aug. 8, 2017), *report and recommendation adopted sub nom. Needham v. Comm'r Soc. Sec. Admin.*, No. 3:16-CV-01380-YY, 2017 WL 4050315 (D. Or. Sept. 13, 2017). The Oregon District has reviewed the ALJ's rationale before and rejected the rationale when it is not supported by the evidence. *Hendricks v. Colvin*, No. 2:14-CV-00439-SU, 2015 WL 3893503, at *8 (D. Or. May 6, 2015), *report and recommendation adopted in part, rejected in part sub nom. Hendricks ex rel. Hendricks v. Colvin*, No. 02:14-CV-00439-SU, 2015 WL 3892286 (D. Or. June 24, 2015) (finding that "the ALJ's speculation is not evidence that undermines [the doctor's] opinion"); *Slover v. Comm'r, Soc. Sec. Admin.*, No. CV-10-258-HZ, 2011 WL 1299615, at *17 (D. Or. Apr. 4, 2011) (finding that the record does not support the ALJ's conclusion that the nurse practitioner was influenced by inappropriate motives or sympathy because "the ALJ has no affirmative evidence of her 'stepping out of her role' as an objective treating medical source and assuming an inappropriate role as an advocate," and the record shows "no badgering or insistent demands by plaintiff that [the nurse practitioner] write him a letter of support.").

The ALJ did not cite any evidence of inappropriate motive or sympathy of Dr. Balm. Accordingly, the ALJ's rationale is speculative and fails to meet the specific-and-legitimate legal standard.

### b. Dr. Balm Offered No Substantive Functional Analysis.

Dr. Balm opined that Plaintiff's CMT "impairs gait and functional use of his hands." Tr. 816. The ALJ found that Dr. Balm's opinion did not offer substantive functional analysis and offered no explanation. Tr. 86.

While the ALJ may reject Dr. Balm's opinion because the opinion is "brief, conclusory, and inadequately supported by clinical findings," Dr. Balm's opinion is supported by his

treatment notes.  Dr. Balm documented specific medical observations and measures of Plaintiff's CMT impairment. Tr. 600, 609.

As to functional analysis in medical opinions, the Oregon District has found that rejecting a medical source's opinion merely because of the absence of specific functional limitations in the opinion is erroneous. *Knight v. Berryhill*, No. 3:15-CV-02262-JE, 2017 WL 3526677, at *7 (D. Or. July 26, 2017), *report and recommendation adopted sub nom. Knight v. Comm'r of Soc. Sec.*, No. 3:15-CV-02262-JE, 2017 WL 3527701 (D. Or. Aug. 15, 2017) (the ALJ's rejection of a PMHNP's opinion "merely because it did not contain specific functional limitations was an erroneous rationale.").  Omission of specific functional limitations in treatment notes is also not clear and convincing evidence to reject a plaintiff's testimony.  *Lawson v. Massanari*, 231 F.Supp.2d 986, 995 (D. Or. 2001).

Additionally, the Commissioner's Regulations do not impose a requirement that medical opinions must include a functional analysis. *See* 20 C.F.R. § 404.1527(a)(1) ("Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.").

In light of the Oregon District's holding addressing similar issues, this Court finds that the ALJ did not satisfy the substantial evidence requirement when he conclusively rejected Dr. Balm's opinion on the basis of lack of substantive functional analysis without explanations. Because the ALJ failed to provide adequate reasons to discredit Dr. Balm's opinion, the Court credits Dr. Balm's opinion. *Lester*, 81 F.3d at 834.

### III. Subjective Symptom Testimony

When a claimant has medically documented impairments that could reasonably be expected to produce some degree of the symptoms complained of, and the record contains no affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of . . . symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996) (internal citation omitted). A general assertion the claimant is not credible is insufficient; instead, the ALJ must "state which … testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (internal citation omitted). If the ALJ's finding regarding the claimant's subjective symptom testimony is "supported by substantial evidence in the record, [the court] may not engage in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (internal citation omitted).

Social Security Ruling ("SSR") 16-3p[4] provides that "subjective symptom evaluation is not an examination of an individual's character," and requires the ALJ to consider all of the evidence in an individual's record when evaluating the intensity and persistence of symptoms. SSR 16-3p, *available at* 2016 WL 1119029 at *1-2. The ALJ must examine "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *4.

---

[4] Effective March 28, 2016, SSR 16-3p supersedes and replaces SSR 96-7p, which governed the assessment of claimant's "credibility." *See* SSR 16-3p, *available at* 2016 WL 1119029.

Here, the ALJ discredited Plaintiff's subjective complaints based on two reasons: (1) Plaintiff's inconsistent statements made to his physicians, the Social Security Administration, and during his testimony at the hearing, Tr. 81; and (2) Plaintiff failed to follow recommended treatments, Tr. 82-83.

The ALJ listed multiple examples of Plaintiff's inconsistent statements. For instance, Plaintiff reported increased stressors but made inconsistent statements about the causes – whether due to his girlfriend's death or her breaking up with him. Tr. 81, 662, 764, 774. Plaintiff reported that he was seeing a "grief counselor" for the death of his girlfriend, but there is no evidence of him participating in any mental health treatment. Tr. 82. Plaintiff testified at the hearing that he drops objects in his right dominant hand, and he has bilateral wrist pain. Tr. 81, 220. However, Plaintiff reported that "wearing his bilateral wrist braces on only four to five occasions resolved his carpal tunnel syndrome symptoms and subsequent medical evidence shows that he failed to mention any recurrent symptoms." Tr. 81-82. Additionally, the record shows that Plaintiff "has been continually noncompliant with his insulin regimen," but Plaintiff reported "excellent compliance with his medications." Tr. 82, 620 (April 2016), 636 (July 2015).

The ALJ found at step two that Plaintiff has the severe impairment of "history of borderline intelligence …" Tr. 74. However, in discounting Plaintiff's subjective testimony based on his inconsistent statements, the ALJ failed to discuss Plaintiff's borderline intelligence which may explain Plaintiff's inconsistencies.

The ALJ also provided examples of Plaintiff's treatment non-compliance. For example, Plaintiff failed to take his carvedilol (cardiac medication) twice daily because of a subjective fear of bruising. Tr. 82, 641. Plaintiff typically maintains a fast food diet and did not see a diabetic dietician until December 2014 despite a referral for him to see one for his "very poor[ly]"

controlled diabetes and poor diet. Tr. 82.  Plaintiff also failed to follow through with the

recommendations to seek mental health treatment and acknowledged at the hearing that his

medical insurance could cover this treatment. *Id.*

"[I]f the medical reports or records show that the [claimant] is not following the treatment

as prescribed and there are no good reasons for this failure," the [claimant]'s statements may be

less credible. *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012) (citing SSR 96-7p).

"Moreover, a claimant's failure to assert a good reason for not seeking treatment, 'or a finding by

the ALJ that the proffered reason is not believable, can cast doubt on the sincerity of the

claimant's pain testimony.'" *Id.* (citing *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).

Where reasons for non-compliance are provided but no medical evidence supports that the

claimant's non-compliance was "attributable to her mental impairment rather than her own

personal preference," it is reasonable for the ALJ to conclude that the level or frequency of

treatment was inconsistent with the level of complaints. *Id.* at 1114.

Here, in addition to the severe impairment of a history of borderline intelligence, the ALJ

also found that Plaintiff has the severe impairments of unspecified depression, anxiety disorder

not otherwise specified, and panic attacks as a reaction to stress. Tr. 74.  However, the ALJ failed

to discuss these severe mental impairments when discounting Plaintiff's subjective testimony

based on his treatment non-compliance.  The ALJ's discrediting of Plaintiff's subjective

testimony is not supported by substantial evidence in the record.

Based on his flawed discounting of Dr. Puckett's opinion, Dr. Balm's opinion, and

Plaintiff's subjective testimony, the ALJ found that Plaintiff could perform occupations such as

escort vehicle driver, assembler small products I, electronic assembler, and food checker. Tr. 87.

However, when the Vocational Expert was asked whether a hypothetical individual who was

"comfortable only at rest" – which are NYHA Class II and Class III symptoms – could perform the identified jobs, the Vocational Expert responded that performing the jobs identified by the ALJ would not be considered to be at rest. Tr. 239 ("Not in my perception of that word [resting]."). The Vocational Expert also responded that "[i]t would … preclude all occupations" if an individual could only occasionally handle and finger with his dominant upper extremity. *Id.* According to the Vocational Expert's testimony, Plaintiff would be found disabled if his testimony is credited.

"[W]here the ALJ improperly rejects the claimant's testimony regarding his limitations, and the claimant would be disabled if his testimony were credited, 'we will not remand solely to allow the ALJ to make specific findings regarding that testimony.' Rather, that testimony is … credited as a matter of law." *Lester*, 81 F.3d at 834. The Court therefore credits Plaintiff's testimony as a matter of law.

## CONCLUSION

The Commissioner concedes that the first prong of the credit-as-true analysis is met. As discussed above, there are no outstanding issues to be resolved. The second prong of the credit-as-true analysis is met. Additionally, it is clear from the record that the ALJ would be required to find Plaintiff disabled. The third prong is satisfied.

For the reasons set forth above, the Court remands this case for the immediate calculation and award of benefits.

DATED this 10th day of July, 2019.


  /s/Mustafa T. Kasubhai
Mustafa T. Kasubhai
United States Magistrate Judge